Judgment rendered July 21, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,098-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

MARK FULLER, III                                    Appellee

versus

TRACY LANDRUM FULLER                                Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2012-1754

Honorable Bernard Scott Leehy, Judge

* * * * *

BREITHAUPT, DUBOS & WOLLESON, LLC       Counsel for Appellant
By: K. Lamar Walters, III

RICHARD L. FEWELL, JR., APLC            Counsel for Appellee
By: Richard L. Fewell, Jr.

* * * * *

Before MOORE, COX, and THOMPSON, JJ.

**COX, J.**

This child custody suit arises out of the Fourth JDC, Ouachita Parish, Louisiana. Mark Fuller, III and Tracy Landrum Fuller consented to joint custody of their three children with Tracy designated as the domiciliary parent. Mark filed a petition to modify custody, which the trial court granted. The trial court signed the judgment modifying custody on December 8, 2020. Tracy now appeals that judgment. For the following reasons, we affirm the trial court's judgment modifying joint custody and naming Mark the domiciliary parent, and we remand the visitation schedule to the trial court for modification.

## FACTS

Mark and Tracy were married in 2007. Three children were born to this union, L.F., P.F., and H.F.[1] Mark filed for divorce on June 1, 2012. A hearing officer heard the matter, and on August 2, 2012, issued a hearing officer conference report ("HOCR"). The HOCR recommended the parties share interim joint custody of the minor children, with Tracy designated as the interim domiciliary parent. Because of Mark's work schedule, his interim visitation was as follows: during the weeks that he had 5 days off, he was entitled to have the children from when he picked them up Friday at school until he dropped them back off at school the following Tuesday; the following week, he was entitled to pick up the children Monday at school and return them to school the following morning. As to the child support calculation, the HOCR stated Mark worked at two jobs, but did not have

---

[1] L.F. was born before the marriage and is currently 17 years old. P.F. and H.F. are twins and are currently 12 years old.

proof of income from one of the employers. Tracy was unemployed. Mark was ordered to pay $1,700 per month in interim child support and $400 per month in interim periodic spousal support. On August 8, 2012, the trial court made the HOCR a temporary order.

The judgment of divorce was rendered January 28, 2014. A consent judgment was filed on July 2, 2014, in which the parties agreed to joint custody. Tracy was designated as the primary domiciliary parent, and Mark's visitation schedule remained the same as in the temporary order. The consent agreement also designated a schedule for holidays, school breaks, and summer vacation. Mark's child support was set at $2,100 per month, by agreement of the parties. Mark and Tracy agreed to alternate claiming the children as dependents for income tax purposes.

On December 23, 2014, Mark filed a rule for modification of custody, child support, and for contempt. He claimed circumstances changed which warranted and justified a change in the custody arrangement, and he requested domiciliary-parent status. He stated that he was recently engaged and could provide a more stable, supportive, and structured environment for the children. He also claimed Tracy did not have a stable environment and alleged the following: she does not have stable employment; she has a gambling addiction; she has stolen money from his parents; she was fired as a bookkeeper for theft; she is under investigation for embezzlement of over $100,000 from her employer; her home is under foreclosure; she did not allow his visitation of the children at times; she plans events for the children during his visitation times; L.F. was in need of counseling; and, he now has flexible hours at a new employer.

On January 14, 2015, the State filed an ex parte motion and order to change payee, rule for contempt, and request for immediate income assignment because Tracy alleged that Mark was behind in his child support payments in the amount of $15,007. Tracy attached an affidavit of arrearages, alleging Mark began missing payments in February 2013. The trial court signed an immediate income assignment order. Tracy and Mark both signed and filed another affidavit of arrearages, signed on the same day as the first one, which showed Mark paid his child support obligation every month, and was not behind on his payments.

Tracy filed peremptory exceptions of no right of action and res judicata. She argued that Mark's allegations of a gambling addiction, undiagnosed bipolar disorder, stolen money, and her being fired for theft were all raised by him previously in 2012. She stated that he had no right of action on the basis that he had an excellent support system and has a new employer because both of these existed at the time of the consent judgment. In addition, he was living with his now-fiancée at the time the consent judgment was signed. Tracy then filed a rule for contempt because their consent judgment stated neither party shall have overnight guests of the opposite sex while the children are in the residence. She alleged that Mark had his girlfriend spend the night when the children were visiting him.

At the hearing officer conference, the hearing officer granted Tracy's exceptions. The HOCR stated that the father only made one or two "new" allegations and they were irrelevant, immaterial, or he was unable to prove them. The HOCR stated that the parents agreed to put the children in counseling and agreed to exchange the children in a public place when the

3

exchange does not occur at the children's schools. Neither party filed objections to the HOCR. The HOCR was adopted and implemented by the trial court on September 15, 2015.

On October 13, 2016, Mark filed a rule to modify custody and for contempt, in which he alleged the following:

- Tracy has been evicted from and lost her residence to foreclosure. The children must sleep on the floor when they reside with her and have not maintained proper hygiene. They do not take regular baths at her residence. When they do bathe at her residence, they must take cold baths because the gas bill does not get paid.

- Tracy has filed false reports in both bankruptcy court and child support proceedings claiming Mark is behind on child support payments.

- Tracy has openly spoken negatively about Mark to the children—stating they do not have to speak to him, he lies, and he committed adultery while they were married.

- Tracy has not communicated with Mark regarding L.F.'s counseling or the name of his therapist.

- Tracy has unilaterally changed Mark's weekend visit schedule to weekends when he worked.

- Mark remarried and is able to provide a stable home and support system.

- Mark has exercised primary responsibility for assisting the children with their schoolwork. The children's school performance has suffered due to Tracy's unwillingness to properly supervise.

- Tracy has not complied with the doctor's instructions regarding P.F., and the child required surgery on her left ear due to ear infections.

4

- Tracy tells the children they need to return to court and tell the judge that they want to live with her.

- Tracy has attempted to alienate the children in the following ways: becoming confrontational with Mark in the presence of the children, refusing to allow the children to speak with their father or paternal grandparents during extracurricular activities or school functions, and offering to buy the children things if they do not speak to their father.

Tracy filed a peremptory exception of no right of action arguing that Mark had failed to meet his burden under *Bergeron*.[2] She stated she was not evicted but left voluntarily; the children have not been forced to sleep on the floor; and, she has not neglected the children's hygiene. Tracy stated Mark was in contempt for failing to maintain dental and vision insurance for July and August 2016, failing to provide proof of life insurance in which the children are named beneficiaries, and failing to provide timely reimbursement for medical expenses and extracurricular activities.

A hearing officer conference was held on February 17, 2017. The HOCR stated that Tracy and the children lived in a three-bedroom rental duplex, which Tracy contends is an adequate home. The hearing officer stated that Tracy's loss of the home after telling the court she would keep her payments current and filing a factually false affidavit with Support Enforcement Services shows she is not necessarily truthful and does not keep her word, but does not seem to be material enough to change domiciliary custody. Regarding Mark's claim that Tracy would not tell him the psychologist's name, the hearing officer was unable to determine who is

_____

[2] *Bergeron v. Bergeron*, 492 So. 2d 1193 (La.1986).

5

telling the truth, but stated it did not harm the children and was not a material change to modify domiciliary status. The HOCR stated the evidence related to P.F.'s ear infection and surgery occurred prior to the previous conference and is not a change since the last court date. The hearing officer found that filing the false support affidavit in district court and bankruptcy court occurred before the previous conference and "is literally not a change in circumstances." The allegations of not allowing the children to speak to Mark in public were a "he said, she said" issue which could not be resolved, but the hearing officer determined Mark could not carry his burden of proof that day. The HOCR did not recommend a change in the custody arrangement. The HOCR was made temporary by the trial court on March 5, 2017.

Mark filed an objection to the HOCR. He argued Tracy's loss of the family home warrants a change in circumstances. Mark stated that he intended to produce evidence at trial of Tracy's alienation of the children and that the current custody situation was not in the best interest of the children. He objected to the hearing officer's determinations that Tracy's failure to disclose the psychologist was not sufficient to modify custody, that Tracy was properly addressing the needs of the children, and that she consistently engaged in actions to alienate the children was res judicata.

Tracy also filed objections to the HOCR. She argued that all of Mark's arguments should have been dispensed with on the exceptions of no cause of action or res judicata. She stated these matters were either addressed at a previous conference or are immaterial.

Upon Mark's motion, the trial court ordered P.F. and H.F. to be interviewed by Whitney Foster, a counselor at Family Solutions Counseling, and Ms. Foster to render an opinion to the court at the time of trial.

On July 18, 2019, proceedings began before the trial court regarding the objections to the HOCR. Richard Reeves, the former husband of Mark's current wife (Andrea Fuller), testified first on behalf of Mark. Mr. Reeves and Andrea had one child, I.R., together before divorcing. He stated that he and Andrea did not have a contentious divorce, Andrea is domiciliary parent, and they work together well in sharing joint custody of their child. Mr. Reeves stated he has always been welcome in Mark's home and never had any reason to be concerned about his daughter living there.

Mark's father, Mark Fuller, Jr., testified that he has had good interaction with the children, Mark, and Andrea. He stated that he has seen some strain at times in Mark and L.F.'s relationship when Mark would ask L.F. to do something and L.F. would not do what he was asked. He stated that it was not easy to have a relationship with Tracy, and Tracy told them that she did not want them around. He stated visits at Mark and Tracy's former home were not good and he could feel the "tension in the air."

Mark's mother, Brenda Fuller, testified that she keeps the children when Mark and Andrea are at work. She stated that she and L.F have a close relationship. She testified that she knows of issues between Mark and L.F. when it comes to rules in Mark's house that L.F. does not think he has to follow. She stated that L.F. has told her he would want to live primarily with his mom. P.F. and H.F. have never told her what they would prefer. She stated that she believes Tracy has fewer rules than Mark. She testified

7

that she believes Mark, Andrea, and the children get along well. She stated that she did not know of any problems or negative feelings between the children, but mentioned L.F. and I.R. may have been jealous of each other as stepsiblings when their parents first married.

Terry Winkler, a coworker and friend of Mark's, testified that he and his family go on vacations with Mark and Mark's family. He also stated that he and Mark are on a deer lease together and Mark brings his kids hunting. He testified that he has not seen any interactions between Mark, Andrea, and the children that would raise any red flags. He stated that he witnessed them getting along and enjoying being together.

Andrea testified that she agreed with Mr. Reeves, her ex-husband, that they have a positive relationship and co-parent I.R. well together. She stated that as she witnessed the interactions between Mark and Tracy, she was "traumatized for the kids and [herself]." She testified that she feels she has a positive relationship with L.F., P.F., and H.F. Andrea stated that there was a little "sibling rivalry" between L.F. and I.R. when they all first moved in together, but it did not last long. She stated that the transition of everyone being in the same house and living as a family went smoothly. Andrea described incidents where picking up the children from Tracy were difficult. Andrea stated she would meet to swap the children with Tracy because it was easier on her work schedule than Mark's schedule. She stated that after several times of picking up the children, Tracy would not release them to her until Mark showed up. She described instances where she and Mark thought the pick-up time was at 6:00 p.m. and Tracy said it was at 3:00 p.m. so they were not able to get the children that week. Andrea stated there were a

couple of instances when they were supposed to pick the children up after school and the children would not be at school when they got there.

Andrea testified that after L.F. began counseling, she saw a huge improvement in his relationship with Mark. She stated that L.F. would have tantrums and get upset when he did not get his way or did not like Mark's rules and consequences. She stated that he would calm down after he and Mark would talk everything over, but the tantrums became less frequent after he started counseling. Andrea testified that Tracy does not communicate about the children's medical appointments or extracurricular schedules with them. She stated that she and Mark had to call around to different doctorss offices to find out which psychologist L.F. was seeing. She testified that P.F. had an ear surgery around Thanksgiving that they were not aware of until P.F. told them and handed them a bag of antibiotics. Andrea stated they were not given any discharge instructions or pain medication from Tracy and had to call the doctor to find out if they were to remove the packing from surgery that was still in P.F.'s ear.

Tracy testified that she has been married four times. She testified that she has been working part-time doing clerical accounting work and her job allows her to be home by 2 o'clock in the afternoon, which correlates with the children's school schedule. She stated that she and Mark have not had verbal communication in years and they primarily communicate through email, in which both of their attorneys are cc'd. Mark's attorney questioned why the court should believe any of her testimony when she has filed inaccurate documents under oath. Tracy responded, "There was confusion on the child support document that was done under oath. But my children

9

have never been in ruins to where they're forced to sleep on the floor or had cold showers." Tracy denied telling the children anything about the divorce; she also denied ever discouraging the children from speaking with Mark or his family at extracurricular activities or school events. She stated that she has never blocked Mark's phone number on the children's cell phones, but L.F. blocked Mark's number. She testified that she did block Andrea's number from both P.F.'s and H.F's phones.

Tracy testified that she and Mark have confusion or disagreements on when summer vacation is to start. Tracy denied or explained away all of Mark's allegations, especially those regarding visitation issues and disagreements. Tracy testified that she has sent Mark medical bills for the children and receipts for extracurricular activities and has not been reimbursed by Mark for his portion of the payments. Tracy stated that P.F. and H.F. do not want to stay at Mark's house because they are not treated fairly. She stated that she takes P.F. and H.F. to church "maybe six times within a year" (L.F. chooses not to attend) and encourages their Christian faith.

Whitney Foster, an expert in family counseling, testified that Mark contacted her about counseling P.F. and H.F. Ms. Foster stated that she had to get permission from Tracy, as the domiciliary parent, before she could begin sessions with P.F. and H.F. Ms. Foster went through her session notes for the court. She described how P.F. recalled multiple instances of Tracy telling them lies about Mark. P.F. stated in counseling that Tracy blocked Mark from calling P.F.'s phone, but later removed the block. Ms. Foster stated that P.F. had a recurring theme in counseling of wanting to live with

10

both of her parents at the same time. H.F. wanted equal time with both parents. Ms. Foster testified that in one session, H.F. stated, "I like both my parents. I'm hoping my Dad can find a neighborhood near my Mom."

Ms. Foster testified that both girls described instances of crying themselves to sleep and not knowing why; P.F. reported that she is homesick and missed her Dad. Ms. Foster stated that in her opinion, Tracy's actions were forms of parental alienation over the children.

Mark testified that he is a registered nurse, hospital supervisor, and teaches medical classes at a community college. He described an instance of the children coming to his house and complaining of no baths or cold baths. He said P.F. and H.F. would have matted hair and some of the knots would have to be cut out because they could not be brushed. Mark testified regarding P.F.'s ear infections. He stated that he took P.F. to the doctor's office multiple times and sent her antibiotics, ear drops, and instructions to Tracy's house. The nurse practitioner who examined P.F. told Mark that her ears were healing slowly and it was imperative that she take all of her medication. Mark stated that after speaking with the doctors, it was his understanding that the ear infection got out of control, which led to damage and slow healing. This out-of-control infection has been attributed to the failure to use antibiotics appropriately and timely.

Mark stated that he helps the kids with their homework and has enrolled them in online tutoring as needed. He testified that the children had failing grades primarily on days which correlated with their days at Tracy's house. Mark testified that L.F. has confronted him about abusing Tracy and having affairs when they were married. Mark stated that he had to be firm

11

with L.F. that those things did not happen and when he is old enough, he can read the divorce papers for himself to see why they actually divorced. He also described instances of L.F. not speaking to him in public so he would not get in trouble with Tracy and instances of Tracy being confrontational with him in public. Mark testified that he places an importance on the children attending church and fostering their spiritual growth.

The trial court spoke with L.F. in a closed hearing and received letters from P.F. and H.F., which are sealed in the record. L.F. testified in open court regarding a protective order that was filed against Mark during the custody proceedings. He stated that the protective order was filed because Mark pinned him against his truck. He stated that the night before the incident, Andrea asked for his phone because he had been staying up too late and making too much noise. He refused to give her his phone and locked himself in his room. He stated that he did not feel that her taking his phone was "justified." L.F. testified that although he thought his actions were rude, he did not give her the phone because he did not like her. He testified that the next evening, he was sitting outside when Mark got home from work and they were discussing what happened the night before when Andrea asked for his phone. He stated that Mark told him that he was disrespectful and to go inside and set his phone on the counter, which he declined to do. Mark also told L.F. to clean his room and mow the yard. He testified that when he refused, Mark pinned him against the truck and took his phone.

L.F. stated that he would describe the environment at Mark's house as "hostile" for him and his sisters and there was a lot of "psychological abuse." L.F. testified he has not had contact with Mark since this incident

and would prefer supervised visitation if he continues to go to Mark's house. He stated that H.F. did not get along well with P.F. and I.R. and was often left out at Mark's house. L.F. testified that Andrea makes P.F. and H.F. cry sometimes.

During the protective order hearing, L.F. was questioned about his punishment at his mom's house versus his dad's house, and he responded, "I don't raise hell at my mom's house like I do at my dad's house." Mark motioned at the hearing to have the protective order involuntarily dismissed. The trial court agreed that there was no need to have a protective order based on the evidence presented and involuntarily dismissed the protective order.

At the end of the hearings, the trial court issued its 26-page written reasons for judgment, which was filed December 8, 2020. The trial court denied Tracy's exception of res judicata. The trial court also denied Tracy's motion to strike Mrs. Foster's testimony because she could not be both a counselor to the children and custody evaluator. The trial court found that Mrs. Foster testified as to issues that were reported to her by P.F. and H.F. that could have the effect of parental alienation, but did not provide testimony regarding her opinion as to the proper custody arrangement for the children. The trial court found that Mark met his burden of proof as to the material change in circumstances. As to the best interest of the child factors outlined in La. C.C. art. 134, the trial court found the following:

1. The potential for the child to be abused—This factor is inapplicable as neither parent has inflicted mental abuse as defined by La. Ch. C. art. 603, nor is there any indication of any potential abuse by either parent.

2. Love, affection, and other emotional ties between each party and the child—Both parents love their children, but the trial court was "persuaded by the testimony, that Tracy has taken actions, in her words or deeds, to damage the love, affection, and the strong emotional ties that the children have enjoyed with their father." Because Tracy took "unnecessary actions in an effort to damage the children's relationship with their father," this factor weighed in favor of Mark.

3. Capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child—Although both parents have the capacity to give their children love and affection, Mark has shown a greater capacity to provide for the children's education and to provide spiritual guidance.

4. Capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs—Both parties had the capacity to provide for food, clothing, and other material needs, but Mark, as a registered nurse, was in a better position to assess the medical needs of the children.

5. The length of time the child has lived in a stable, adequate environment, and the desirability of maintain continuity of that environment—Tracy did not provide a consistent stable and adequate environment for the children; her history did not allow the trial court to infer long-term stability. Mark's living environment

was more consistent, and he sincerely tried to engage in co-parenting with Tracy. This factor weighed slightly in favor of Mark.

6.  The permanence, as a family unit, of the existing or proposed custodial home—Tracy has resided in her residence since 2017 and Mark in his residence since 2014. Mark stated was trying to move into the children's current school district. This factor weighed in favor of Tracy because if Mark does not get moved into the current school district, then moving the children to a new school district would be detrimental to their best interests.

7.  The moral fitness of each party, insofar as it affects the welfare of the child—Tracy's perjury on two separate occasions could have resulted in criminal prosecution and one could have caused great harm to Mark. Tracy's willingness to engage in this conduct was an indication of lack of moral fitness. Tracy did not present any credible evidence that Mark was morally unfit; therefore, this factor weighed in favor of Mark.

8.  History of substance abuse, violence, or criminal activity—This factor is inapplicable because no credible evidence was introduced by either party.

9.  Mental and physical health of each party—This factor is inapplicable because both parties were mentally and physically healthy.

10. Home, school, and community history of child—Again, if Mark was unable to move into the current school district, this could be

detrimental to the best interests of the children. This factor weighs in favor of Tracy.

11. Reasonable preference of the child—All three children were of sufficient age to express a preference. P.F. and H.F. would like equal time with both parents. The trial court found that L.F.'s preference to live with his mother has to do the with rift between Mark and L.F. caused by Tracy's leniency toward discipline and willingness to allow L.F. to do as he wants. The trial court stated it was in the best interest of the children to craft a custodial arrangement that will allow, as much as possible, equal time with both parents. Therefore, both parents will have to properly communicate. Tracy's efforts in communicating were found to be inadequate.

12. The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and other party—Tracy engaged in parental alienation both intentionally and subconsciously, which is the primary reason the consent judgment has failed. This factor overwhelmingly favors Mark, "and demands a modification of the custody arrangement."

13. Distance between the residences—This factor was irrelevant because the parties lived in close proximity to each other.

14. Responsibility for the care and rearing of the child previously exercised by each party—Tracy has had the primary responsibility for the care and rearing of the children, but her manner and methods have caused issues that rendered her unfit to carry on with those

16

responsibilities, which were described in detail in considering the other factors. Normally, this factor would weigh in favor of the primary custodial parent, but did not weigh in favor of Tracy.

After considering the above factors, the trial court found that the best interest of the children will most effectively be met by joint custody with Mark being designated as the primary custodial parent. Tracy's visitation consisted of having the children every other weekend, major holidays being split 50/50, and alternating weeks in the summer. As to Tracy's rule for contempt for Mark failing to pay his portion of the children's expenses, using his wife as a proxy in co-parenting, not adhering to the summer schedule, and other specified acts, the trial court found the claims did not rise to the level of contempt. The trial court denied Mark's rule for contempt as it was based on the same factors which formed the basis for the custody change. Therefore, the punishment for contempt would have been inequitable. Each party was responsible for their own court costs.

Tracy now appeals the trial court's judgment.

## DISCUSSION

*Modification of Custody and Domiciliary Parent*

Tracy does not dispute that there has been a material change in circumstances to warrant a review of the consent judgment. However, she disagrees that the changes made by the trial court are in the children's best interests. She argues that the trial court improperly considered co-parenting issues within multiple factors.

In most child custody cases, the trial court's determination is based heavily on factual findings. *Harrel v. Harrel*, 52,248 (La. App. 2 Cir.

17

6/27/18), 251 So. 3d 546. Child custody decisions are reviewed under the abuse of discretion standard. *Leard v. Schenker*, 06-1116 (La. 6/16/06), 931 So. 2d 355; *Harrel v. Harrel, supra.* The determination of the trial judge in child custody matters is entitled to great weight, and that discretion will not be disturbed on review absent a clear showing of abuse. *Leard v. Schenker, supra; Harrel v. Harrel, supra.*

Neither party argues the trial court improperly determined there was a material change in circumstances or improperly continued the joint custody scheme. Therefore, the first issue we must consider is whether the trial court erred in designating Mark as the domiciliary parent.

In designating the domiciliary parent, for purposes of joint custody determination, consideration must be given to the factors in La. C.C. art. 134 and any other relevant factors. The principal consideration in every child custody case is the best interest of the child. *Nichols v. Nichols*, 32,219 (La. App. 2 Cir. 9/22/99), 747 So. 2d 120. La. C.C. art. 134 states, in pertinent part:

> A. Except as provided in Paragraph B of this Article, the court shall consider all relevant factors in determining the best interest of the child, including:
>
> (1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.
> (2) The love, affection, and other emotional ties between each party and the child.
> (3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
> (4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
> (5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

18

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(7) The moral fitness of each party, insofar as it affects the welfare of the child.
(8) The history of substance abuse, violence, or criminal activity of any party.
(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.
(10) The home, school, and community history of the child.
(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.
(13) The distance between the respective residences of the parties.
(14) The responsibility for the care and rearing of the child previously exercised by each party.

While the court is not bound to make a mechanical evaluation of all the statutory factors listed in La. C.C. art. 134, it should decide each case on its own facts in light of those factors. Nor is the court bound to give more weight to one factor over another; rather, when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. The factors are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. *Abrams v. Turner*, 52,922 (La. App. 2 Cir. 9/25/19), 282 So. 3d 304.

In child custody cases where two parents are fervently competing for custody and domiciliary status of the children, frequently the trial court must determine the best interest of the children solely from the testimony of the parents and their respective relatives or friends. This naturally passionate and self-interested testimony is rarely objective, leaving it to the trial court,

who is in the best position to view firsthand the demeanor and tone of the witnesses, to assess the credibility of the witnesses, and decide how much weight to give the testimony in light of the factors in La. C.C. art. 134. *Abrams v. Turner, supra.*

In the case before us, the trial court found it was in the children's best interests to grant domiciliary status to Mark. In discussing the factors, the trial court stated multiple times that Tracy acted to damage the relationship between Mark and the children. Testimony revealed that Tracy would reprimand the children for speaking to their father in public, she blocked his phone number on the children's cell phones, and Tracy engaged in parental alienation of the children. The trial court found this to be the primary reason that the previous custody arrangement failed and demanded modification.

The trial court found factors two, three, four, five, seven, and 12 to be in favor of Mark and factors six and ten to be in Tracy's favor. Tracy argues that factors two, four, seven, and 12 should not have weighed against her, and factors three, five, 11, and 14 should have been in her favor. She asserts that the trial court improperly considered actions of parental alienation within multiple factors and weighed those factors against her. She argues that Mark spoke to the children about wanting to modify the visitation schedule to see them more; Mark has more education, but she still has the capacity to love them and provide them with food and other necessities; the children have done well in school while under her care; and, her false statements in court regarding child support had no effect on the minor children.

We disagree with Tracy's arguments. The trial court is in the best position to assess witness credibility and weigh their testimonies. The fact that both parents have struggled to properly communicate with each other does not negate the fact that Tracy has exhibited behavior consistent with parental alienation. The trial court is to weigh the factors in light of the evidence presented and is given the discretion to weigh the factors as it sees fit. The factors are not a game in which one parent "scores" a factor and the parent with the highest "score" wins. Depending on the facts of each case, one factor may carry more weight than it would in another case.

The trial court found that Tracy's actions of alienation and trying to keep the children from Mark were overwhelming reasons to modify custody and designate Mark as domiciliary parent. Even if additional factors should have been in Tracy's favor, those few factors are not enough to overcome the trial court's discretion in placing more weight on the alienation. In reviewing the factors, particularly the alienation exhibited by Tracy, in light of all the testimony presented at trial, we find that the trial court did not abuse its discretion when weighing the factors and naming Mark the domiciliary parent. This assignment lacks merit.

*Visitation Schedule*

Tracy argues that the trial court erred in substantially decreasing her time with the children. She argues that her visitation of every other weekend during the school year is an excessive limitation on her time with the children. Tracy highlights that her visitation time is less than Mark's visitation time under the previous order.

21

The trial court's finding that joint custody is in the best interest of the child does not necessarily require an equal sharing of physical custody. *Collins v. Collins*, 36,629 (La. App. 2 Cir. 10/23/02), 830 So. 2d 448. Substantial time rather than strict equality of time is mandated by the legislative scheme providing for joint custody of children. *Abrams v. Turner, supra.* Every child custody case must be viewed on its own particular set of facts and relationships involved, with the paramount goal of reaching a decision which is in the best interest of the child. *Nichols v. Nichols, supra.*

A joint implementation order shall allocate the time periods during which each parent shall have physical custody of the child so that the child is assured of frequent and continuing contact with both parents. La. R.S. 9:335(A)(2)(a). Our jurisprudence has not defined "frequent and continuing" in terms of a minimum amount of time. Frequent and continuing contact must be determined based on the facts of each case.[3]

Tracy was given every other weekend from 5:30 pm Friday to 5:30 pm Sunday during the school year, alternating weeks in the summer, and one half of all major holidays. This amounts to four nights a month during

---

[3] In *O'Brien v. O'Brien,* 30,001 (La. App. 2 Cir. 12/10/97), 704 So. 2d 933, alternating weekends, alternating holidays, and six weeks in the summer was held not to be frequent and continuous contact. In *Ellinwood v. Breaux,* 32,730 (La. App. 2 Cir. 3/1/00), 753 So. 2d 977, the court added two weeks in the summer to make the visitation schedule frequent and continuing. The *Ellinwood* schedule became alternating weekends, alternating holidays, and 6 weeks in the summer. In *Collins, surpa*, the court modified the visitation schedule to give the children frequent and continuing contact—every other week Wednesday through Sunday and 8 weeks in the summer. In *Bingham v. Bingham,* 42,140 (La. App. 2 Cir. 4/4/07), 954 So. 2d 842, the court stated that giving mom custody of the children during the school year and dad custody during the summer (with some specific visitation carved out) was frequent and continuous visitation. The *Bingham* court distinguished the case from *Collins* because *Collins* involved parents who communicated well with each other and fostered the children's relationships with the other parent.

approximately nine months out of the year and approximately six weeks during the summer, plus one half of holidays.

Under the facts of this case, we do not find this visitation schedule to be frequent and continuing. This is not a case where the parents live so far apart that each parent cannot get the children to school during the school year. In fact, Mark was looking to move closer to Tracy in order for the children to stay in the same school district. Although factors three and four were in favor of Mark, the trial court stated that both parties have the capacity to love and care for the needs of the children.

The major breakdowns in the previous custody agreement were the communication between the parents and Tracy's actions of parental alienation. Both parents must do better communicating with each other in order to ensure the children's needs are met. Given the change in the visitation schedule, Tracy's parental alienation actions should be less frequent and effective, even if she is designated a few more days a month during the school year. Additionally, the children are accustomed to seeing both of their parents more than four days a month. Allowing Tracy a little more visitation time during the school year will help ensure the children have frequent and continuous contact with her.

For these reasons, we remand the visitation schedule back to the trial court to craft a schedule that gives Tracy more than four days a month during the school year.[4]

---

[4] We note that the trial court is in the best position to determine how best to schedule the visitation, whether it be additional nights when Tracy already has the children or adding time to the weeks she does not have the children. As the parents struggle to communicate, the schedule should be clear on when the school year ends and begins in order to transition to the summer schedule.

*Child Support and Tax Deductions*

Tracy argues that if this Court finds that the trial court abused its discretion in modifying custody and designating Mark as domiciliary parent, then the termination of child support and award of dependency tax deductions must also be manifestly erroneous. We did not find the trial court to be manifestly erroneous in modifying custody and designating Mark the domiciliary parent. Therefore, the termination of Mark's child support payments and yearly permission to claim the children on his income taxes were proper.

## CONCLUSION

We affirm the trial court's judgment modifying joint custody and naming Mark the domiciliary parent, and we remand the visitation schedule to the trial court for a modification to allow the children frequent and continuous contact with Tracy. Each party bears its own costs associated with this appeal.

**AFFIRMED IN PART; REMANDED WITH INSTRUCTIONS.**